The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Robert J. Steigman presiding. Thank you, Mr. Bailiff. Our last case this afternoon is 423-0593, People of the State of Illinois v. Allen Schimmelfennig, if that's pronounced correctly. For the appellant, would you please state your name? Amy Kemp. Thank you. And for the appellee, please state your name, sir. James Ryan Williams. Each party will have 20 minutes for your argument, and then the appellant will have a five-minute rebuttal time. And with that, then, Ms. Kemp, you may proceed. Good afternoon. May it please the Court, Council. My name is Amy Kemp. I work at the Office of the State Appellate Defender, and I represent the appellant, Allen Schimmelfennig. Here, the state tried to prove a murder without a motive, without an eyewitness, without an inculpatory statement by the accused, and without the body of the alleged victim. So the state used voir dire to impanel a jury that was predisposed and pre-educated to accept its gap-ridden theory of the case, and the trial court allowed it to do so. Then the state used an expert whose testimony lacked even the barest of explanations of the reasoning process behind her opinion, and defense counsel allowed it to do so. This was first-pronged plain error and ineffective assistance to counsel. Beginning with the issue relating to expert testimony, here, trial counsel's performance was deficient because he failed to challenge the foundation for Dr. Yeoman's expert opinion testimony that the blood loss implied by photographs of a red-stained floor would have been fatal absent immediate medical attention. Counsel, is it your contention that the foundation for her expert testimony had to be given? She had to testify to it all before she testified to her ultimate opinions? No, Justice Steigman. We recognize that under Illinois Rule of Evidence 705, the expert may testify to her opinion without giving the basis, therefore, on direct testimony, but she will be required to give the basis for her opinion on cross-examination should counsel recognize his duty to bring out the weaknesses and foundation where they are present. The state, in questioning her, essentially elicited her opinion without going into her foundation beyond the fact that she was a forensic pathologist that had performed lots of autopsies, but then on cross-examination, the defense counsel didn't probe further into what the basis for her expertise is. Is that your position? That's correct. Defense counsel asked, I believe, four questions on cross-examination, essentially having Dr. Yeoman repeat the fact that she had only looked at photographs and had not measured the stains on the floor or herself visited the storage unit. You contend, if I understand you correctly, that she was a forensic pathologist and that she was not qualified to testify about the blood stains. Is that correct? Go ahead. It's not an issue of a lack of qualification. It's an issue of a lack of foundation for the expert testimony that she offered. I would agree that it's not evident why a forensic pathologist whose experience is in examining the bodies of deceased persons would have any special knowledge or education experience in estimating the amount of blood loss depicted in photographs of a red stain floor, but I would acknowledge it's possible that a forensic pathologist could have that required education or experience. The issue here is the foundation for that expert opinion is lacking. More specific, you said in your brief that Dr. Yeoman was not qualified as an expert in blood stain pattern analysis, which is, I guess, what you're identifying her testimony to be. Is that correct? She was not an expert in that? I think the portion of my brief that you're quoting is an attempt to point out to the court that she was qualified as an expert in one field, not another, but that's not the basis for the foundation problem here. The foundation problem is that regardless of what kind of an expert she was qualified as, she had to give reasons behind her opinion. As we just established, she's not required to do that on direct examination before she gave her opinion. Is that right? That's correct. Having given her opinion, the state wasn't obligated to try to add further foundation for her expertise afterwards, was it? The state was not obligated and that's not the argument. You're claiming that defense counsel was obligated on cross examination to bring out that she had no foundation for the opinion she offered? Defense counsel was not obligated to ask questions to probe the foundation for her opinion. Is it possible that had counsel done so, her testimony would have established that her opinion was soundly based? I think it's theoretically possible, yes, but I have pointed to persuasive authority indicating that this type of estimation from photographs is extremely suspect. There was certainly a basis from which to attack the foundation. Under Petrie, we know that the very process of attacking counsel, as long as it's possible, that had she been cross examined about her foundation for this testimony and might have established that in fact she could run an opinion because of her training and expertise, isn't the appropriate vehicle for your claim a post conviction petition as opposed to direct appeal? A post conviction petition in which the defendant could call her and have a record on what the testimony would be as opposed to our speculating now in your argument that had she been cross examined at this point, defense counsel would have shown she had no foundation. Wouldn't a post conviction petition be the more appropriate vehicle? No, I don't believe so. Again, under Petrie, which was a direct appeal, the second district found ineffective assistance of counsel where the foundation wasn't sufficiently probed for the expert opinion. The court there noted that the very act of requiring her to do so would have communicated to the jury that her opinion was not infallible, but was instead the subject of debate among experts who engage in her field. And so. Correctly decided? Yes, I believe it was. Any other case besides that? So hold it. Petrie is the case that I found that was most analogous to. Why should we be persuaded by it? As you know, we're not bound to follow it. And why should we not wait for a post conviction petition as a vehicle to avoid speculating about what doctor humans would say and actually to hear what her testimony would be? In other words, counsel, wouldn't it be terrible if we have a murder conviction? We reversed it on the grounds you argue, and then she testifies and turns out she had entirely appropriate foundation for this testimony. But again, the process of cross examination would have communicated to the jury that this person's expert opinion was not infallible, that there were bases from which to doubt it, and that other experts might come out in a different way. And well, did you have any experts who you're going to call to testify differently? I'm sorry, me on appeal? Well, the defense counsel, anyone show that they have any contrary expert testimony? There's no record on that. And again, under Petrie, their defense counsel actually did put his own expert on the stand to counter the foundation or the low foundational lacking foundation, expert opinion testimony by the state and the second district still found efficiency there. Let me ask this other question, counsel, from the state's brief. The state asserts as a practical matter, any person, lay or expert who views the photo of a large pool of the victim's blood would no doubt also conclude that the victim could have died there or would at least have needed immediate medical attention. It would be contrary to human experience for anyone to conclude otherwise after viewing a pool of blood that appears to be roughly three feet in diameter. That's essentially the situation that Dr. Eumann testified about. In closing argument, defense counsel argued that Dr. Eumann was, quote, simply eyeballing, unquote, the photos and no measurements were taken. Dr. Eumann has been cross-examined by defense counsel and, as you said, should have occurred and explained in perhaps great detail exactly why she was of the opinion she had. Wouldn't that have made this argument by defense counsel much more difficult to make? We know that Dr. Eumann could not have provided testimony on measurements because she didn't measure the blood stains and, in fact, the state's attorney conceded in its own closing argument that no one had measured the blood stains. So when counsel on appeal conjectures that the stain was a certain diameter, there's nothing in the record to support that. The photograph that we do have and the main photograph on which Dr. Eumann's opinion was based has no, there's no scale. It's taken from the perspective that can be distorting. So we can't conjecture. But counsel, if I may, the cross-examination of Dr. Eumann's, there was the suggestion, you know, reminding you just looked at the photographs, and he went into those issues. So how is the cross-examination of Dr. Eumann's expert testimony objectively irrational and unreasonable? Because that's really what we have to look to. Well, the expert opinion testimony was most likely inadmissible if counsel had explored the foundation or the lack of foundation for her opinion testimony. He only emphasized what the state had already brought out on direct, which is that she was basing her opinion on nothing more than photographs. He didn't ask whether experts in her field, in the field of forensic pathology, ever reasonably rely on photographs of bloodstains and forming opinions on the amount of blood loss implied by those photographs. And if he had done so, again, the persuasive authority that cited in the opening brief indicates that she could not have answered that question in a way that would have established foundation. I think if we didn't know that the bloodstains were unmeasured, that this argument would be a lot more difficult. But we know that the bloodstains were unmeasured. So we know that she did nothing more than eyeball the photographs of the bloodstain. And under foundation, it just requires so much more than boldly stating an opinion based on a method that has not been shown to be one that's reasonably relied on by experts in that field. Counsel, in your reply brief, you write that the state's response in its brief does not account for your criticism, your citation of authority indicating that because photographs of unmeasured bloodstains are not reasonably relied upon by forensic pathologists informing opinions about blood loss implied by the photographs, any such estimate still would not have provided a foundation for documents of opinion, citing several pages in your opening brief. Those pages contain no such authority, counsel. And the only authority coming close to so holding is an unpublished decision from the Michigan Court of Appeals that you cite, which is People versus Merriman, where there were two, three experts who testified about a similar matters in this case, namely bloodstain. They were an orthopedic surgeon, a forensic pathologist, and chief medical examiner. And the medical court, the Michigan Court of Appeals rejected the defense arguments in those cases and affirmed the conviction. Yes. So primarily, where's the case law that says somehow that the forensic pathologist could not consider bloodstains? Primarily, the authority that I'm referring to is the Hernandez case out of California, because there we have a very candid FBI agent who got on the stand and testifies that their efforts to find a bloodstain pattern analyst who was willing to take both photographs and measurements of bloodstains and estimate the blood loss depicted in those photographs were completely unsuccessful. They couldn't find a bloodstain pattern analyst who was willing to do so. The FBI agent went on to explain that estimates by doctors, nurses, and first responders are often inaccurate. As for the Michigan case, there, the three experts did not only look at photographs. Those bloodstains in those cases were both measured and investigators had made determinations regarding the loss of blood that was represented by the amount of photographs and measured blood. One of the experts in that case, the chief medical examiner, also considered a university study on the extrapolation of blood volume from surface area. So the experts in Merriman, that Michigan case, were working with much more than photographs. But I do think the reference in my reply brief was primarily to Hernandez because of that FBI expert's testimony. And I did look for Illinois case law on point, and I didn't find any, which is why I resorted to these out-of-state cases. So the persuasive reporting... Well, in Hernandez you had affirmative evidence that undercut the testimony of the expert witness, is that right? I'm sorry? You had affirmative evidence in Hernandez that undercut the testimony of the forensic pathologist? Is that correct? The FBI agent's testimony undercut their testimony about the reliability of the bloodstains? Are you... I'm sorry, I don't understand if you're asking about the facts of Hernandez or whether... Yes, yes. As you described Hernandez, there was testimony by an FBI agent that undercut the expert reliance on bloodstains, was there not? My recollection of Hernandez is the FBI agent explained that he could not find a bloodstain pattern analyst who would testify. And so he himself conducted an elaborate experiment involving known quantities of blood, replicating the flooring on which the stains were found, and so on, in order to get an accurate or the most accurate possible estimation of the amount of blood loss that was implied by bloodstains that were found in the defendant's apartment. And I think that bloodstain... Excuse me, blood volume experiment in that case is interesting because it shows just how many facts go into the size of a bloodstain and the volume that's represented by the size, namely the flooring. Was there any attempt made to clean the bloodstain? Is it dilute by water or a cleaning agent? Those are facts that we don't have in this case because the state did no more than put this expert on the stand who just boldly stated based on no more than photographs that this would have been a fatal wound. And going back to... I'm sorry, I believe it was Justice Lannert's question on... Couldn't... My apologies, maybe it was Justice Steigman's question. Couldn't we just, as lay people, look at this photograph and know that the wound would have been fatal? That's not what happened in this case because the state not only put an expert on the stand to tell the jury this would have been a fatal wound, but then the state wrapped itself in that testimony and over and over emphasized the testimony in its closing argument and its rebuttal closing argument. And so regardless of whether a lay person could eyeball a photograph and determine that an amount of blood loss would have been fatal, and I don't believe that a lay bloodstains on the floor and know certainly whether it would have been fatal to a person whose size that they didn't know. The jury didn't even know how large Ms. McCook was. They didn't know how much blood loss would be fatal to a man of that size. On this record, Dr. Yeomans didn't know those facts. So we have to... The question is, even if this testimony shouldn't have been admitted, how prejudicial is it, given that the testimony of a large bloodstain on the floor certainly would suggest, as the state argues, to most people, this is a pretty serious wound and this guy is likely to die. I think it would suggest that, yes, but beyond a reasonable doubt, without the expert testimony, the state's evidence on the fact that that was inadequate, the state could not have gotten there. And I think the state's attorney recognized that, which is why they put her on the stand and why they emphasized Dr. Yeomans' testimony over and over and over and over in the rebuttal and... Excuse me, in the closing argument and rebuttal of the closing argument's references to Dr. Yeomans' testimony and how the state's attorney wasn't arguing from the juror's common sense or common experience. The state's attorney didn't urge the jury, hey, just look at these photographs. You can tell this would have been a fatal wound. The state's attorney said, trust the expert, trust the expert, and over and over again pointed to Dr. Yeomans' testimony. And that's how we know that the error here is prejudicial, because if counsel had actually followed his own defense strategy to its proper conclusion and not just begun questioning on the inadequate foundation, but completed it, he likely could have kept Dr. Yeomans' testimony out altogether. But even if he could not have done... You've expired your time. I gave a little extra time because I asked you a lot of questions, but your time's up, and you have an opportunity to address this again in rebuttal. Thank you. Okay, Mr. Williams, you may proceed on behalf of Appalachia. May it please the court, counsel. My name is James Ryan Williams, and it is my privilege to represent the state before this honorable court. At the time of the defendant's trial, in this case, there was seemingly only one case that addressed Supreme Court Rule 431a in the context of juror bias and no-body murder cases, and that was People v. Faulkner out of the Fifth District, 1989. And there, the court held that in order to effectively impanel a jury free of bias or prejudice against a state case wherein the victim's body has not been recovered, it is necessary to inquire of potential jurors whether they possess any prejudice or bias which might preclude a finding of guilt beyond a reasonable doubt. Now, despite this clear precedent that's directly on point, the defendant in this case has argued that the trial court here committed a plain error, a clear and obvious error, that because it is arguable that part of the reasoning underlying our Supreme Court's decision in Encolado could apply to no-body murder cases. Now, importantly, Encolado is not a no-body murder case. The court did not overturn Faulkner, and in fact, the court didn't even discuss or cite Faulkner. Instead, the Supreme Court declined to find an abuse of discretion where the trial court refused the defendant's proffered voir dire question probing juror bias of testimony from those who patronize prostitutes. In so holding, the court discussed multiple reasons for its decision, including the lack of case law or authority establishing that the public harbors bias against those who, like the defendant in that case, patronize prostitutes. That the asserted bias in Encolado was not supported by a substantial body of law, and therefore the trial court did not find an abuse of discretion in refusing the question, does not create some general rule of law that bias can only be examined where there is indeed some substantial body of law establishing that bias. And it certainly does not create some watershed rule that justifies overturning a conviction where the arguable application of the reasoning in Encolado was never brought to the trial court's attention or the state's attention or the application of that reasoning to the facts of this case conflicts with seemingly the only case on point, which notably has never even received negative treatment. So the defendant here is seeking to change the law, i.e. ask this court to disagree with Faulkner pursuant to the plain error doctrine. As this court has repeatedly explained, plain error doctrine is not a general savings clause but a narrow and limited exception for noticing errors that are based on law that is well settled at the time of trial. Plainly makes no sense that one could use a doctrine explicitly reserved for noticing errors that are based on well-settled law as a means of changing the law and creating a new error. A trial court cannot clearly or obviously err by committing yet to I'm sorry. Counsel, if I may, just to circle back to Faulkner just a moment. In that case, the questions that were posed to potential jurors were rather general. For example, if the court instructs you it's not necessary for the state to produce a body in this matter to sustain a conviction, will you follow the law or instructions? Or do you have any quarrel with the concept the state is not required to produce a body in this case? In the case before us now, those questions were a little more specific. Those questions being would you require the body of Gabriel Cook to have been found in order for you to find a defendant guilty of first-degree murder? And then it goes on to if you answer yes and the secondary question. My question is do the specific facts that were introduced to these questions somehow require us to distinguish this case from Faulkner? Because those questions are more specific here with regards to the identity and the specific charge. Well, I don't know that the distinction of mentioning the victim's name. I'm struggling to see the distinction there or why that would be of any importance. I mean, at the end of the day, the state's ultimate position here is just simply that the defendant can't be asking this court to change the law or distinguish the law pursuant to the plain error doctrine. But that's exactly what they're asking to do. Defendants are essentially arguing that the argument that he's making now for the very first time on appeal is such a great argument that the trial court should be held to have made a clear and obvious error for not having the clairvoyance to know what the defendant might one day argue before this court. And in state's opinion, that's fundamentally unfair to the trial court who never had a chance to consider this argument. It's unfair to the state who never had a chance to respond to or compile any contrary evidence. It's unfair to the victim's family who would be asked to endure the trauma and stress of another trial. And frankly, it's unfair to the taxpayers of Illinois who are asked to foot the bill of litigating in case after case after case, novel arguments that are never presented to the trial court and only raised for the first time on appeal. And so at the end of the day, that's ultimately the state's position here is we're asking that this court help combat the seemingly increasing trend of criminal defendants seeking a change in the law pursuant to the plain error doctrine. And so the state respectfully asked that this court provide a clear statement that defendants cannot seek a change in the law pursuant to a doctrine that is explicitly reserved for noticing errors based on well-settled law. Now, I'm sorry if that doesn't directly answer your question, your honor. But with respect to the argument that counsel focused on ineffective assistance, the defendant here is complaining that his counsel did not meaningfully challenge the pathologist's opinion that the large pool of the victim's blood on the floor of his storage unit indicated that the victim, quote, could have died or needed immediate medical attention. Now, first of all, as a practical matter, literally anyone who sees a three-foot pool of blood would almost assuredly conclude that the person who left that blood may have died or may have needed medical attention. So the pathologist's opinion here, at worst, might have nominally bolstered that inevitable conclusion. So there's simply not a reasonable likelihood that the defendant would have been acquitted if only the pathologist did not state the obvious. Moreover, there was likely a strategic reason for counsel's limited questioning on point. While the defendant assumes that more question regarding the basis of the opinion would have necessarily meant more doubt, the opposite, frankly, is probably true because it would have put a greater focus on the pathologist's opinion. It would have given the pathologist the opportunity to further showcase the medical knowledge underlying that opinion. And it would have precluded what was objectively a rather effective closing argument that enabled the defense counsel to argue and point out potential deficiencies in the pathologist's opinion. But in the event... It's a little off the beaten path here, but I'm curious about it. I don't recall, we have a murder with a missing body. At trial, did the state argue or offer any to the jury or musing with the court about what happened to the body? Not to my recollection, your honor, but I didn't specifically focus on that point. I'm confident you've slogged through this record extensively. What's your theory? If you're asking me to speculate on what might have happened to the body, I mean, as I understand it, the vehicle was disposed of at or near the Illinois River. Conceivably, the body could have been thrown in the river, floated downriver, and in that way disappeared. I would also note, I mean, I actually personally own river property and I know that it floods regularly. So if the body were perhaps buried there... I'm sorry to interrupt you. This is... I've been curious about this because I've seen a lot of murder cases, but I don't recall one where we're missing a body and the police work was seemingly so excellent and thorough. I was just surprised that the body never turned up. Okay, go ahead. I'm sorry. You may continue. I will agree with you, your honor. I mean, honestly, this case really stood out to me. And frankly, that's how in my planned remarks, if we were to discuss the sufficiency of the evidence, that was what I was going to start with is that while this is, I mean, I feel like this could almost be a law school textbook case of circumstantial evidence because while it is circumstantial, the evidence is overwhelming. The police work, the investigators work in this case was truly exceptional and it stood out to me in that way. Just the thoroughness of the police work. So I agree with your honor that it is rather inexplicable that the body was never discovered. And unless this court has any further questions. No, I see none. Thank you, counsel. Thank you for your time. On behalf of the appellant, you may make your rebuttal argument at this time. Thank you. Just briefly, Justice Steigman, the state's attorney did speculate in closing argument that Mr. Cook's body had been taken down to the river. The state's attorney conjectured that Mr. Schimmel-Fennig quote, got rid of the body in the river. Interestingly, the same cell phone data that the state relied on in trying to place Mr. Schimmel-Fennig with Mr. Cook did not place him by the river, by the Illinois River. Thank you for answering my question. You're welcome. As to Faulkner and this notion that there was some change in the law, that is simply not correct. Faulkner was not good law at the time of trial in this case. Again, counsel has come before this court and ignored Illinois Supreme Court Rule 431A, which of course was on the books for decades prior to this trial and forbids specifically any wider questioning about law or instruction. Counsel, let me read you a quote from the Illinois Supreme Court in 2012, People v. Reinhart. This is what the court wrote. Specific questions tailored to the facts of the case and intended to serve as preliminary final argument are generally impermissible, but see People v. Faulkner, holding that the state may inquire whether veneer members have deep-seated beliefs that prevent them from returning a guilty verdict in a murder case where the state cannot produce direct evidence of the victim's body. The Supreme Court, as we know, being on the appellate court, doesn't often cite appellate court decisions, much less seemingly approvingly as they did here in Faulkner, which seems to be right on point as opposed to Encraldo, if that's how it's pronounced. Why isn't this some indication that, as opposed to what you just argued, that the Faulkner case is not aberrational but sufficiently well decided to be worthy of mention by the Supreme Court? Two responses, Justice Steigman. The first would be that my understanding of the but-see citation is that's not generally considered to be a favorable citation. Second, Reinhart would predate Encraldo. So not only does Rule 431A, of course, long predate the trial in this case, Encraldo does as well. And counsel for the state is, of course, correct that Encraldo was not a no-body murder case. It was a case regarding where the defendant wanted to ask the jury about their feelings regarding patrons of prostitutes. But in the analysis in Encraldo, the court isn't talking about only just cases regarding patrons of prostitutes. The court is talking about, generally speaking, the inappropriateness, the improperness of water questioning that touches on the evidence in the case that the jury is about to hear and giving generally applicable principles so that trial courts can know when those questions are appropriate. And it's a very general rule that the general public has deep-seated prejudice. Not only that, Encraldo, the opinion in Encraldo suggests that the proponent of the question needs to come forward with evidence that the general public has deep-seated prejudice, requiring an exception to the general rule that you can't get into the evidence of the particular case. I think it's really telling here that the trial court, in agreeing to allow these questions or to give these questions during voir dire, referred to them as instruction itself. And the state then did not request an instruction, a non-pattern jury instruction, regarding the necessity of, excuse me, the permissibility of proving death through circumstantial evidence. Why didn't the state request such an instruction? Well, it had already instructed the jury that it didn't need the body to prove the murder. Had the state requested such an instruction, would it have been appropriate for the trial court to give it? I believe, depending on the wording of the instruction, absolutely. The law in Illinois is clear that death may be proved through circumstantial evidence, and it is perhaps a peculiar enough case to require instruction on that point, if I may briefly conclude. But the time for that instruction is after the jury has heard all of the evidence, not before the jury has even been in panel. Thank you. Thank you, counsel. Thank you both for your arguments. The court will take this matter under advisement, issue a decision in due course, and will now stand in recess.